

**FILED**

MAY - 2 2016

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
                    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

Quinton Joey waTTs/F-78495
(Name of Plaintiff)
norTh Kern STaTe Prison /A-A5-143
(Address of Plaintiff)
P.O. Box 5000/Delano, Calif 93216

**2 16 - CV - 0 9 2 6**     **AC PC**
_____
(Case Number)

vs.

COMPLAINT

Taymour E. MALAK, MD

DaviD T. AnsLinGER

_____
(Names of Defendants)

I.  Previous Lawsuits:

A. Have you brought any other lawsuits while a prisoner:     ☒ Yes     ☐ No

B. If your answer to A is yes, how many?:  **One**_____  Describe the lawsuit in the space below.  (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper using the same outline.)

1. Parties to this previous lawsuit:

Plaintiff **Quinton Joey waTTs**

Defendants **LyDia RomERO, WARDEn (CSP-FoL) T. BuTLER CDW (A)
[CSP-FoL] S. Cummings, CAPTain L. CHAYLA. AW-P**

FORM TO BE USED BY A PRISONER IN FILING A COMPLAINT
UNDER THE CIVIL RIGHTS ACT, 42 U.S.C. § 1983     Rev'd 5/99

1

2.  Court (if Federal Court, give name of District; if State Court, give name of County)

EASTERN DISTRICT

3.  Docket Number   21

4.  Name of judge to whom case was assigned   Kimberly Mueller

5.  Disposition  (For example: Was the case dismissed? Was it appealed? Is it still pending?)
   dismissed without Prejudice

6.  Approximate date of filing lawsuit   11/9/2014

7.  Approximate date of disposition   6/30/2015

II.  Exhaustion of Administrative Remedies

A.  Is there a grievance procedure available at your institution?   ☐ Yes      ☐ No

B.  Have you filed a grievance concerning the facts relating to this complaint?
                                                        ☒ Yes      ☐ No

   If your answer is no, explain why not _____

C.  Is the grievance process completed?                ☐ Yes      ☐ No

III.  Defendants

(In Item A below, place the full name of the defendant in the first blank, his/her official
position in the second blank, and his/her place of employment in the third blank.  Use item B
for the names, positions and places of employment of any additional defendants.)

A.  Defendant Taymour E. MALAK       is employed as Doctor Malak
   MD                          at 2800 n. California ST, Stockton, Calif 95204 STE 11

B.  Additional defendants David T. Anslinger PA. assistant Doctor
   Stockton, Calif 95204   2800 n. California sT ste 11

2

IV.   Statement of Claim

(State here as briefly as possible the facts of your case. Describe how each defendant is involved, including dates and places. Do not give any legal arguments or cite any cases or statutes. Attach extra sheets if necessary.)

in Late 2006 or 2007 I was Severly beaten and stumped in my head and body. I don't remember
what hospital I was Taken To. between 2007 and 2008, I went Through a Lot of repercussion's medically
because of That. my primary doctor at That Time was doctor malak. on 1/15/2007 at Damron
hospital in stockton, calif, I was being Treated in The emergency room for a head injury. I was having
"seizures" or "blackouts". what The hospital found was a part of my brain called The sella which
was slightly large and needed close follow up with an mri, if not, I could get several
symptom's and seizure's was one of Those Symptom's. I don't recall Dr. Malak doing any
follow up, also i recall having some problem's That could have been because of a
seizure or blackout's, and serious memory loss, "continuance on attached paper"

V.   Relief.

(State briefly exactly what you want the court to do for you. Make no legal arguments. Cite no cases or statutes.)

give me and my kids 8.year's of monetary damage To our life, also a copy
of my medical record I have been Trying To get for year's. Then I want To see
him in here where he belong' and me at home with my kids

Signed this __25__ day of __april__, 20 _16_.

_Quinton Wath_
(Signature of Plaintiff)

I declare under penalty of perjury that the foregoing is true and correct.

__4/25/2016__
(Date)

_Quinton Wath_
(Signature of Plaintiff)

3

Dr Malak never informed me as to what was going on with me, or warned me of any physical manifestation which might cause danger to me. I should have received much better medical care from my primary doctor who is also the policy maker in his Firm. On 10/5/2008 I was the driver of my step Fathers Tour bus, on the way to Colusa Casinos. I had a seizure and had a serious accident that Killed 10 people including my step father. Dr Malaks assistant cleared me medically at DMV on 3/4/2008 There is a stamp on the DMV Form saying Taymour E. Malak. MD and the address. I sent a complaint to the Medical board of California on Taymour Malak For clearing medically to drive a car and a diesel Truck. They found Dr Malak assistant david anslinger guilty of negligence and suspended his License. I feel Dr Malak being not only my primary doctor but also the policy maker and owner of this Firm put not only my Life, but my wife and kids Life in danger by not holding up to a professional and ethical obligation to his patient.

EXHIBIT  A

**IMPORTANT:** The examination and treatment that you have received in the Emergency Department has been given on an emergency basis only and is not intended as a substitute for complete medical service. It is important that you be ~~checked again as instructed.~~ At you notice any worsening of your symptoms promptly call your referral doctor or return to the hospital. If an Xray or EKG has been performed, it has been read on a preliminary basis only, and will be reviewed by a radiologist or internist within 24 hours. You will be notified if additional findings are noted.

**YOUR DIAGNOSIS IS:** _Altered Mental Status Resolved / Possible post-ictal_

| TRAUMA | ADULT | PEDS |
|---|---|---|
| Laceration/Puncture　Head Injury | Viral URI　　Pneumonia/Bronchitis | Fever Control　　　Otitis Media |
| Sprain/Strain　　Concussion* | Gastroenteritis　　Asthma | Viral URI　Pneumonia/Bronchitis |
| Burn/Abrasion　Neck/Back Pain | Ulcer/Gastritis　　COPD flare* | Gastroenteritis　　Asthma* |
| Contusion　Corneal Abrasion* | Esophagitis*　Tension Headache | Pharyngitis, viral* Poisoning, peds* |
| Fracture　　　Abscess* | Chest Wall Pain*　Hypertension, new | Pharyngitis, strep*　Febrile seizure* |
| Cast & Splint Care　Cellulitis* | Seizure, recurrent*　Dehydration* | Pharyng, strep pend'g*　Croup* |
| Crutch Rental　Animal Bite* | Allergic Reaction*　Overdose* | Hives*　　Conjunctivitis* |

**GYN - GU ~**

Miscarriage, Spont.　　PID
Miscarriage, Threat.　Ovarian Cyst
Irregular Vag Bleed　　Curettage
Vaginitis*　　Menstrual Pain*

Cystitis, fem　　Kidney Stone*
Pyelonephritis　GC/Chlamydia*

Occasionally, people have a serious reaction to medications, such as vomiting, rash, swelling, or trouble breathing. If this happens, stop the medication and seek medical care.

☐ YOU HAVE BEEN GIVEN A SEDATIVE, HYPNOTIC, OR NARCOTIC MEDICATION. DO NOT DRINK, DRIVE OR OPERATE MACHINERY WITHIN 24 HOURS.

☐ Recheck with _____ in _____ days, or call San Joaquin Medical Society @ 952-5299 for a physician referral.

**ADDITIONAL INSTRUCTIONS:** ① _You must follow up with your doctor & ask for an MRI. Tonight on your CT-Scan there was an area called "Sella" which was slightly large & needs a close follow up with an MRI._ ② _If you develop fever/chills, nausea/vomiting or seizures_

**YOUR EMERGENCY DEPT. PHYSICIAN HAS BEEN:** _return to ER._

Learning Barriers　☐ N/A　☐ Addressed _____
☐ Exit Writer Instructions Given　☐ Spanish Version

**I have received and understand the instructions outlined above.**

X _Quinton Watts_　X _K. Steele M_　　_1/16/07_　_0505_
Patient or representative　　Hospital Staff　　　Date　　d/c Time

DAMERON HOSPITAL WORK/SCHOOL NOTIFICATION FORM

_____ was seen in the Emergency Department on _____
He/she should be able to return to work/school on _____ with the following restrictions:
_____ : X _____ ,MD

EMERGENCY DEPARTMENT PRESCRIPTION

| Drug Name | Mg. | Disp | Sig. |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

☐ Spanish instructions
☐ Do not substitute

PHYSICIAN SIGNATURE: _____  PRINTED NAME: _E. Shirey_ MD

A. Levine, MD　V. Ansley, MD　E. Arnett, MD　P. Febres, MD　B. Reinke, MD　T. Thinh, MD
D. Shirley, MD　D. Lee, MD　G. Saffarian, MD　S. Ramakrishnan, MD　P. DaVisio, PA
M. Hudock, PA　A. Zeiter, MD　M. Osman, MD　M. Barkley, MD　J. Gladden, MD

DAMERON HOSPITAL ASSOCIATION

525 WEST ACACIA STREET
STOCKTON, CALIFORNIA 95203

7010-911 (1/20/05)

WATTS, QUINTON J
00104876982 DOB: 02/05/1956 M
MR:348645 01/15/2007 KMR:
DR. VALLEY EMERGENCY, PHYSICIANS

©2001-2003 T-System Inc. Unauthorized alterations/markings in negatives.

14

**EMERGENCY NURSING RECORD**
**Neurological Complaints**

TRIAGE DATE __15/4m__ TIME __2230__ Immediate (2A) 2B

NAME: __Watts, Quinton__
AGE: __50__ (M) / F
HISTORIAN: X patient __paramedics __family __gir Hriend
ARRIVAL MODE: X car __EMS __police____
PCP: __none __Walat
IMMUNIZATIONS: current / not current / referral____
LAST TETANUS:__

**CHIEF COMPLAINT** __ __
started ____ ( __hrs/ days/ago) __ __ __
_Started + sleeping uncharacteristic_
_of pt, forgetful, inappropriate answers_

__headache                    X mental status change
__photophobia_____          X fatigue / weakness____
__dizziness_____            __vision change____ __
__syncope_____              __neck discomfort____
__nausea / vomiting x         __seizure activity
__chemical exposure__

**PAIN LEVEL** current: 0 /10

[pain scale faces]

**ALLERGIES** X NKDA / PCN / ASA / sulfa / latex

**MEDS** __none __see med list
Numalog -
Numilin-
BPmeds

**PAST HX** __negative
__CVA / TIA / heart disease / (HTN) / (diabetes: insulin
__past surgeries __none
    __ Drinks beer 2 cans
X smoker / drugs / alcohol __ Has smoked nuvseviv in post
__has been physically hurt or threatened by someone close __Denies

**LNMP** ___ G ___ P ___ Ab ___ pregnant / postmenopausal

**TRIAGE REASSESSMENT**

| TIME | BP | TEMP | PULSE | RESP | O2% | PAIN | CATEGORY |
|------|-----|------|-------|------|-----|------|----------|
| 2230 | 115/86 | 97.4 | 96 | 16 | 100 | 0 | 1 (2A) 2B |
|      |     |      |       |      |     |      | 1  2A  2B |
|      |     |      |       |      |     |      | 1  2A  2B |
|      |     |      |       |      |     |      | 1  2A  2B |

Triage Signature ___[signature]___

NURSING NOTES

WATTS, QUINTON J  00104876982
DOB: 02/05/1956  01/15/2007  M  KMR:
DR. VALLEY EMERGENCY, PHYSICIANS
MR: 348645

---

**VITALS**

| BP | / | P | RR | temp |
|----|---|---|----|----|
| O, Sat% | | GCS | | |
| BP | / | P | RR | temp |
| O, Sat% | | GCS | | |
| BP | / | P | RR | temp |
| O, Sat% | | GCS | | |

**TREATMENT PTA** __see EMS report __c-collar __backboard

**INITIAL ASSESSMENT** TIME:_____ ROOM:____

**GENERAL APPEARANCE**
X no acute distress       __mild / moderate / severe distress____
__alert                    __anxious / decreased LOC
X neat, clean              __unkempt____
                           __tearful / crying____

**FUNCTIONAL / NUTRITIONAL ASSESSMENT**
X appears well nourished   __obese / malnourished____
X independent ADL          __assisted / total care____

**RESPIRATORY**
X no resp distress         __mild / moderate / severe distress____
X nml breath sounds        __wheezing / crackles / stridor.__ __
                           __decreased breath sounds____
                           __tachypnea____

**CVS**
X regular rate             __tachycardia / bradycardia / irrg. rhythm__
X pulses strong            __pulse deficit____

**NEURO**
__oriented x 3             __disoriented to (person)/ (place)/ time
__moves all extremities    X confused
__nml gait                 __weakness / sensory loss __
__PERRL                    __gait (unsteady) / shuffling
                           __dystonia / tremors
                           __pupils unequal__
                           __pinpoint / dilated____

**PSYCH**
A affect appropriate       __depressed / flat affect
X cooperative              __uncooperative / non communicative
__maintains eye contact    __lack of eye contact
__nml speech               __inappropriate speech / behavior
X responds appropriately   __speech soft / slurred / mute /loud
                           __suicidal / homicidal ideation
                           __delusional / flight of ideas
                           __hallucinating visual / auditory

**SKIN**
X warm, dry                __cyanosis / pallor
X intact                   __cool / diaphoresis
                           __open wound / needle tracks / lesion(s)
                           __skin rash

**ADDITIONAL FINDINGS**
denies pain
FSBS 245

Nurse Signature ___[signature]___

WATTS, QUINTON J
00104876982 DOB: 02/05/1956 M
MR:348645  01/15/2007  KMR:
DR. VALLEY EMERGENCY, PHYSICIANS

Printed _____ CONFIDENTIAL
Job 20588 (05/08/2013 13.18) · Page 10 Doc# 6

# RADIOLOGY

CC:  SHIRAZI, EHSAN MD
          aloc

**Procedure:  CT OF THE BRAIN #9**

Multiple axial computed tomography examination of the brain without
contrast enhancement performed.

Normal-sized ventricles with normal brain parenchyma seen without any
parenchymal mass or hemorrhage.  No evidence of epidural or subdural
hematoma being seen.  Questionable prominence of the sella turcica
seen, significance uncertain.  Bony calvarium is intact.

**CONCLUSION:**
Questionable prominent sella, otherwise unremarkable CT examination.
Suggest followup.

Electronically Signed 01/16/2007 14:21:46
DAVID WONG, MD

D: 01/16/2007 09:13:30/T: 01/16/2007 10:27:59/DI: 158787/DN:

WATTS, QUINTON
348645
EMR



**DAMERON HOSPITAL
STOCKTON, CALIFORNIA 95203**

# RADIOLOGY

**PHYSICIAN, CHIROPRACTOR, PHYSICIAN'S ASSISTANT, OR ADVANCED PRACTICE NURSE COMPLETES THIS SECTION**

| DRIVER LICENSE NUMBER | NAME | DATE OF EXAM |
|---|---|---|
| N422,0307 | Quinton Watts | 03-0408 |

### PHYSICIAN NOTE:

Under California law, only a Doctor of Medicine (MD) or Doctor of Osteopathy (DO) can perform a medical examination for persons submitting a medical examination report to operate one or more of the following: School Bus, School Pupil Activity Bus, Youth Bus, General Public Paratransit Vehicle, or Farm Labor Vehicle. The MD/DO *MUST* also sign the medical report and the medical certificate.

DRIVER'S IDENTITY VERIFIED BY:

☑ Driver License No: **N4220307**   ☐ Other Photo ID (Specify ID used):

Medical Examiners Comments on Health History (The medical examiner must review and discuss with the driver any "yes" answers and potential hazards of medications, including over-the-counter medications, while driving.) If the driver has previously been diagnosed with Stage 1, Stage 2, or Stage 3 hypertension and continues to require medication for treatment of hypertension, please indicate here and follow instructions for reduced term of medical certificate.

Note certification status here. See *Instructions to the Medical Examiner* for guidance.
*I certify under penalty of perjury under the laws of the State of California that I am licensed, certified, and/or registered, in accordance with applicable State laws and regulations to perform physical examinations, that I have examined the driver named above in accordance with the Motor Carrier Safety Regulations (49 CFR 391.41—391.49) and with knowledge of the driving duties, I find this person:*

**(CHECK ALL THAT APPLY)**

☑ Meets standards in 49 CFR 391.41; qualifies for 2 year certificate which will expire *(must insert date)* 3 / 13 / 10

☐ Does not meet standards

☐ Meets standards, but periodic evaluation required due to _____
_____ . Driver qualified only for:

  ☐ 3 months ☐ 6 months ☐ 1 year ☐ Other _____
  Medical certificate will expire *(must insert date)* _____ / _____ / _____ .

☐ Temporarily disqualified due to *(condition or medication)*: _____
  Return to medical examiner's office for follow up on _____

**ONLY QUALIFIED WHEN:**

  ☐ Wearing corrective lenses
  ☐ Wearing hearing aid

**CHECK THE BOXES BELOW ONLY WHEN THE DRIVER PRESENTS ONE OF THE DOCUMENTS LISTED, A COPY OF WHICH MUST BE ATTACHED TO THIS REPORT.**

  ☐ Accompanied by a _____ waiver/exemption. Driver must present exemption at time of certification. *(must attach copy)*
  ☐ Accompanied by a Skill Performance Evaluation (SPE) Certificate *(must attach copy)*
  ☐ Driving within an exempt intracity zone *(not applicable in California)*
  ☐ Qualified by operation of 49 CFR 391.64 *(must attach copy of waiver/exemption)*

*A completed examination form is on file in my office.*

| MEDICAL EXAMINER'S SIGNATURE | TELEPHONE NUMBER |
|---|---|
| | 209 465-5891 |

MEDICAL EXAMINER'S NAME (PRINT)
David Anslinger P.A.

TITLE ☐ Physician (☐ M.D. ☐ D.O.) ☐ Chiropractor ☑ Physician's Assistant ☐ Advanced Practice Nurse

LICENSE OR CERTIFICATE NUMBER/ISSUING STATE
CA - PA011818.

ADDRESS
2800 N. Calif. #11. Stockton, CA

If driver meets standards, complete a Medical Examiner's Certificate according to 49 CFR 391.43(h). (Driver must carry certificate when operating a commercial vehicle.)

---

PLACE DOCTOR'S OFFICE STAMP IN THIS SPACE OR ATTACH OFFICE LETTERHEAD

**TAYMOUR E. MALAK, M.D.**
**2800 N. CALIFORNIA ST., SUITE 11**
**STOCKTON, CA 95204**

*DMV COMPLETES THIS SECTION*

| REVIEWED BY (Indicate Tech ID#) | Field Office | HDOS |
|---|---|---|
| | | 517 |

UPDATED BY (Tech #)

DATE UPDATED
5 1 7 MAR 1 4 2008 24

DATE STAMP

| DATE | TIME | PROB# | |
|---|---|---|---|
| 9/2/07 | 3⁴ | | S: (history includes details pertinent to the patient's medical complaint) |

B/S 201

LOC - Orien
Name X

O₂ 96%

O: (physical assessment) T: ___ P: 84 R: 16 B/P: 123/77 Wt:

Unable to give date month/day or year - denies taking any meds. I/m is diabetic

A: (medical/nsg diagnosis. MTAs may not independently analyze or interpret data.)

P: (MTA – referral to a higher licensure for prioritization and evaluation.)
(RN -action to be taken by the RN so that the patient receives appropriate medical care.)

E: (education provided)

| INSTITUTION ASP | ROOM / WING 520 |
|---|---|

OUTPATIENT INTERDISCIPLINARY
PROGRESS NOTES

CDC NUMBER, NAME, (LAST, FIRST, MI)

Watts
#-78495

CDC 7254 (8/89)

STATE OF CALIFORNIA                    DEPARTMENT OF CORRECTIONS

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME *(2400)* | NCIC | OFFICER I.D. | NUMBER | PAGE |
|---|---|---|---|---|---|
| 10-05-2008 | 1810 | 9155 | 16161 | 08-10-06 | 487 |

## Statement of Quintin Joey Watts (continued)

*On Monday, December 15, 2008, at approximately 1130 hours, Investigator Hamann conducted a telephone interview with Quintin Watts. The purpose of the interview was to ask clarifying questions about Watts' prior medical history. Watts' medical records had been obtained after he signed a release of medical records/information. At no time during the conversation did Watts withdraw his consent of the release for the medical records/information. The following transcription of this interview was completed by Investigator Parsons. Extraneous words, such as "uh, um," and repeated words are not included, unless the words changed the meaning of the statement. The audio file of this interview will be retained by the CHP Williams Area.*

SH:     Investigator S. Hamann
QW:     Quintin Watts

*Investigator Hamann telephoned a number at DVI, and an unidentified employee answered the telephone.*

Unknown: Portis.

SH:     Hey, it's Simon.

Unknown: Alright Simon, I'm going to put you on handset free and I'm gonna close the door.

SH:     Okay, thanks.

Unknown: Okay, he's here.

*The employee brought Watts to the room to conduct the telephone interview.*

SH:     Hey Quintin?

QW:     Yes.

SH:     Hey, it's Simon Hamann, we talked last week.

QW:     Oh, yes.

SH:     Hey I just wanted to call and say that, hey thanks for signing that paperwork. We got the medical records and stuff and I wanted to follow-up to see if you had any questions for me.

QW:     Not really, well I did, was wondering when they were gonna, like, release my wallet or stuff or, you know, how long that was gonna be before they did that, release my money.

| DATE OF COLLISION (MONTH-DAY-YEAR) | TIME (2400) | NCIC | OFFICER I.D. | NUMBER | PAGE |
|---|---|---|---|---|---|
| 10-05-2008 | 1810 | 9155 | 16161 | 08-10-06 | 488 |

### Statement of Quintin Joev Watts (continued)

SH: Okay, I don't have that answer off the top of my head, but I will check into that right after I get off here, and so I think by the time you get ready to get out of there that should not be a problem.

QW: Okay, alright.

SH: And we got the records from Doctor Malak.

QW: Uh huh.

SH: I had a few questions on that if you don't mind.

QW: No.

SH: What can you tell me about the seizures you were suffering back in 2007?

QW: I had one, a seizure back in 2007, why I had it I really don't know. I know it, I lost a lot of memory behind it though, but that's about it.

SH: What, what, do you remember what the, your symptoms were when you were having the seizure?

QW: No, not at all. Like I said I lost a lot of memory.

SH: Okay. Was Colene with you when you had the seizure?

QW: I'm not, I think so.

SH: Do you remember what she said that happened to you while you were having the seizure?

QW: No.

SH: And so you went and saw Doctor Malak about that, right?

QW: Yeah.

SH: And what did he kinda prescribe for you to do?

QW: Nothing out of the, nothing out of the abnormal, I mean, I was just still on the same medication, nothing really different.

SH: Okay, and did they ever figure out why you were having the seizures?

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME *(2400)* | NCIC | OFFICER I.D. | NUMBER | PAGE |
|---|---|---|---|---|---|
| 10-05-2008 | 1810 | 9155 | 16161 | 08-10-06 | 489 |

## Statement of Quintin Joey Watts (continued)

QW: No, it was just one that I had. They never really told me or said anything to me about why it occurred, I guess maybe my blood sugar got too high or something, or, I'm not sure.

SH: Okay, looking at the records there it says that you came back in on, in March or something like that and that you were very upset because something hadn't, nothing had been done with the seizure. Why were you upset?

QW: I came back in and I was very upset?

SH: Uh huh.

QW: To the doctor's office?

SH: Yeah.

QW: Jesus, I don't know Mr. Simon I couldn't even...

SH: Okay.

QW: I couldn't tell you.

SH: And then do you remember like this last March you went back into the doctor's office?

QW: Last March...last March. I, I'm not sure why I, I usually go back to the doctor's office to get refills, or one time I went to get some kind of those, what do you call those pills for sexual thing, I don't know, but it wasn't nothing major I don't think.

SH: Okay. I think it was when you went in to get your medical record. I mean, not your medical record, but you get your medical card for your commercial license.

QW: Yeah, okay.

SH: Do you remember what you guys discussed then as far as the seizures were?

QW: No, I don't think so. I don't think, I don't remember Mr. Simon what we discussed, but they gave me my medical card, so obviously, I mean, it wasn't, whatever happened wasn't that serious.

SH: Okay. Do you remember telling him that the reason that you were having the seizures is 'cause you were drinking and taking drugs?

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME *(2400)* | NCIC | OFFICER I.D. | NUMBER | PAGE |
|---|---|---|---|---|---|
| 10-05-2008 | 1810 | 9155 | 16161 | 08-10-06 | 490 |

## Statement of Quintin Joev Watts (continued)

QW: No, I don't remember telling him that.

SH: Okay. And kinda going back to, before the crash on Saturday and Sunday.

QW: Uh huh.

SH: Do you remember what you were doing on the trip in the morning on Sunday, when, I think it's, what's her name, Elaina, was driving?

QW: Do I remember what I was doing?

SH: Yeah.

QW: When Elaina was driving, Saturday morning?

SH: Yeah.

QW: I don't think I was doing anything different than I usually do, sit there and watch, and, or maybe eat or something like that.

SH: Okay. So you weren't like laying down in the back trying to get some sleep while she was driving?

QW: That Sunday morning, I might have, I don't know.

SH: Okay. So you just don't really remember what was going on?

QW: Not, not really. I mean, you know, not to, not, no I don't think it was anything that really I did that, that...

SH: Okay. No, I know it's been a little while, so, alright. And any, anything else that you can think of, any questions I can answer for you? I'll take a look into that wallet when we're gonna release all that, and it should be, we should be done with that by the time you're getting ready to get out. Is it still the 12th or the 14th that you're supposed to be getting out?

QW: According to them it still the 12th, so, you know, I don't't, they haven't changed it, but when the 12th comes and I'm ready to go out they might change it then.

SH: Okay. Okay, so any other questions for me?

QW: No, that's it.

BEFORE THE
PHYSICIAN ASSISTANT BOARD
DEPARTMENT OF CONSUMER AFFAIRS
STATE OF CALIFORNIA

In the Matter of the Accusation Against:

DAVID T. ANSLINGER, P.A.,

Physician Assistant License No. PA 11818

                            Respondent.

Case No. 1E-2011-220483

OAH No. 2013100889

## PROPOSED DECISION

This matter was heard before Administrative Law Judge Jonathan Lew, Office of Administrative Hearings, on August 5, 6 and 7, 2014, in Sacramento, California.

Jannsen Tan, Deputy Attorney General, represented Glenn L. Mitchell, Jr. (complainant), Executive Officer of the Physician Assistant Board (Board), Department of Consumer Affairs.

Scott A. Ginns, Attorney at Law, Cassel Ginns, A Professional Law Corporation, represented David T. Anslinger (respondent).

Evidence was received, oral argument was heard, the record was closed and this matter was submitted for decision on August 7, 2014.

## FACTUAL FINDINGS

1.      On April 7, 1986, the Board issued Physician Assistant License Number PA 11818 (license) to respondent. Respondent's license was in full force and effect at all times relevant to the charges brought in the Accusation, and will expire on January 31, 2016, unless renewed or revoked. Complainant contends that respondent engaged in gross negligence and repeated acts of negligence when he prepared a Medical Examination Report following a physical examination of a patient seeking DMV certification as a commercial driver. Complainant seeks to discipline respondent's license based upon respondent's failure to fully document certain matters in the Medical Examination Report, and for certifying the patient to drive a commercial vehicle despite the patient being on insulin and having a documented history of medication non-compliance for his diabetes and hypertension.

1

2.      At the time of hearing, complainant amended Accusation paragraphs 26(a) and 28(a) to include the language "and/or document" following the word "address" on Accusation page 7, lines 2 and 17.

*Respondent's Background*

3.      Respondent completed his physician assistant training through Cuyahoga Community College in Cleveland, and then interned at the Cleveland Clinic, and various other practices in Cleveland, Ohio. He worked in an emergency room in Monroe, Louisiana for six months. Respondent subsequently moved to Chico, California, where he worked in a family practice setting between 1986 and 1994. He continued through 2008 in a family practice in Stockton, California, under the supervision of Taymour Malak, M.D. Respondent eventually started and continues to operate two urgent care clinics in Lathrop and Manteca, California. He described these clinics as family practices. Respondent personally provides only part time patient care since undergoing spinal surgery in November 2011. He reviews charts, billing documents and patient files. His spouse manages the clinics.

*DMV Commercial Driver Fitness Determinations*

4.      In California, one must hold a valid medical certificate to drive a class A, or B or commercial C vehicle. The law requires a commercial driver to provide a medical report to DMV when application is first made for the license, and every two years thereafter. A licensed physician assistant may be a medical examiner for this purpose, and is required to complete and sign a DMV Medical Examination Report for Commercial Driver Fitness Determination (DMV form). The physician assistant, after completing the medical/physical examination, certifies on the DMV form that a driver applicant either meets certification standards in accordance with federal regulations, or not. The DMV form has attached instructions to the medical examiner, including federal motor carrier safety regulations advisory criteria regarding disqualifying medical conditions. (See 49 CFR § 391.41, subd. (b).) Instructions to the medical examiner on this DMV form notes: "If the medical examiner determines that the driver is fit to drive and is also able to perform non-driving responsibilities as may be required, the medical examiner signs the medical certificate which the driver must carry with his/her license."

*Patient QW*

5.      On March 13, 2008, respondent signed Patient QW's DMV form medically clearing him for a commercial driver's license. On October 25, 2008, while driving a chartered bus through Colusa County, QW lost control of the vehicle, which rolled over. This incident led to the Board's investigation and prosecution of this matter. QW's relevant medical history from September 2004 through March 2008 will be discussed below, followed by consideration of the standard of care for a physician assistant conducting a medical examination for commercial driver fitness determination and certification.

*Patient QW's History from September 2004 through March 2008*

6.   2004.  Respondent worked at Dr. Malak's Stockton clinic over the period 1994 to 2009.  QW was a patient at the Stockton clinic between September 2004 and May 2008.  QW first presented to respondent on September 1, 2004.  He was age 48, and had been diagnosed with diabetes mellitus, and been placed on Glucophage.[1]  His random glucose had earlier been noted to be 636.  Respondent diagnosed QW with adult onset diabetes mellitus.  Respondent added Zestril for blood pressure maintenance and two types of insulin – Humalog 75/25 which is long acting, and Humulin R which has a quick onset.  Respondent instructed QW on a diabetic diet and advised him to keep a glucose log.  He referred QW for a diabetic eye exam, and ordered fasting lab work to be done within two weeks.

On September 15, 2004, QW returned for reevaluation.  He advised respondent that he was not taking his insulin.  Respondent advised QW to be compliant, and gave him a lab order to repeat his lab work.

QW was evaluated again on October 11, 2004.  He advised respondent that he was non-compliant with diet, exercise and medication.  QW had not gotten his lab work done as requested.  Respondent diagnosed QW with insulin dependent diabetes mellitus (IDDM), non-compliant and chalazion left eye.  Respondent re-ordered lab studies, and advised him to follow up in one month.

7.   2006.  QW was not seen again until July 12, 2006.  He had been hospitalized five days prior at Dameron Hospital and respondent saw him on follow up.  QW had been hospitalized for being combative, having a blood sugar of 298 and altered mental status.  Respondent's diagnosis for QW was IDDM, neuropathy, hypertension and rule out seizure disorder.  He reordered diagnostic tests and QW was started on Zestril for hypertension.  He was also referred to neurology and ophthalmology and advised to follow up in one month.

Respondent saw QW on August 10, 2006, for a follow up visit.  His blood pressure was 140/100 and his glycosylated hemoglobin measured 8.6, indicating a three-month average blood sugar of 198.  Respondent diagnosed IDDM and hypertension, and his treatment plan was to increase the dose of insulin and Zestril.

Respondent saw QW again on September 7, 2006.  QW had not done the lab work and was non-compliant with his blood pressure medications.  QW complained of chest pain.  Respondent ordered x-ray, echocardiogram and further lab work.  He instructed QW to take Zestril daily, and added Norvasc to control QW's hypertension.  QW was asked to return in one month.

---

[1] Glucophage (metformin) is an oral diabetes medicine that helps control blood sugar levels.  It is used for people with type 2 diabetes.  Glucophage is sometimes used in combination with insulin or other medications, but it is not used for treating type 1 diabetes.

8.     2007.  Respondent next saw QW on January 17, 2007, as a follow up to an emergency room visit the previous day.  QW was diagnosed at Dameron Hospital with an altered mental status and found to have an abnormality on his brain CT scan with a recommendation of an MRI of the brain.  His hospital physical examination was remarkable for not being alert to time and place.  Respondent noted that QW was not using the long acting insulin, only the regular insulin.  Respondent diagnosed QW with IDDM, altered mental status, seizure disorder, brain mass, and hypertension.  He instructed QW to continue insulin, and referred him for an MRI, complete lab panel, and neurology consultation.

On March 21, 2007, respondent saw QW for an office visit.  Respondent diagnosed QW with seizure disorder, memory loss, hypertension, altered mental status, and IDDM.

On March 23, 2007, QW saw a neurologist.  Respondent heard from QW's wife around that same time.  He was advised that QW had been referred to anger counseling.  On March 29, 2007, respondent noted that QW's wife reported that he was in jail and that she did not know when he would be released.

9.     2008.  Respondent next saw QW nearly a year later on March 4, 2008.  QW requested a DMV physical examination in order for him to be approved for a commercial driver's license.  The record of physical examination noted that QW's blood pressure measured 140/90, and 136/86; and that QW "was on alcohol and drugs that's why I was having seizures."  Respondent further noted "no drugs or alcohol x 1 year."  He diagnosed QW with IDDM, history of seizure disorder, and history of drug abuse.  Respondent ordered labs, and requested the neurology report.

Respondent saw QW for a follow up visit on March 13, 2008.  QW's blood pressure was 150/90.  He weighed 274 pounds.  In the DMV health history portion, the history of seizures section was marked "no."  Respondent listed QW's diagnoses as IDDM and hypertension.  His treatment plan was to increase the insulin dose, the addition of a diuretic for hypertension, referral to a nutritionist and follow up in one month.  On this same date, respondent signed QW's DMV form medically clearing him for a commercial driver's license.  This medical examination report was valid for two years.

Respondent saw QW again on April 28, 2008.  Lab work had been performed.  Respondent diagnosed QW with IDDM – not controlled.

Respondent last saw QW on May 6, 2008, for lab follow up.  QW's blood pressure was elevated at 160/98.  Respondent noted that QW was non-compliant with his blood pressure medication.  Respondent increased QW's insulin.  He advised QW to restart his blood pressure medication, and to follow up in one month.

As noted in Finding 5, on October 25, 2008, while driving a chartered bus, QW lost control of the bus, which rolled over.

*Standard of Care*

10.    Vito G. Almaraz, PA-C, testified as an expert on behalf of complainant. Mr. Almaraz has over 30 years experience as a physician assistant, primarily in family practice and ambulatory care medicine. He received his formal training through the United States Air Force School of Health Care Sciences, and clinical training through the Naval Health Sciences Education and Training Command, Naval Regional Medical Center, Oakland. He was certified by the National Commission on Certification of Physician Assistants in 1977. Mr. Almaraz's professional affiliations include the American Academy of Physician Assistants, and the California Academy of Physician Assistants, of which he served as its President in 1989. He is currently employed with Golden Valley Medical Associates in Bakersfield, California. Mr. Almaraz has served for 17 years as an expert consultant for the Medical Board of California Physician Assistant Committee, and has reviewed and rendered opinions in over 300 cases on the standard of care received by patients treated by physician assistants.

11.    Mr. Almaraz reviewed the certified medical records of QW from the office of Dr. Malak, San Joaquin General Hospital, and Dameron Hospital. He also reviewed summaries of care provided by both Dr. Malak and respondent, along with related documents; including an 801 report, delegation of service agreements, patient care protocols and medical journal articles; as well recordings of interviews of respondent (9/10/12) and Dr. Malak (11/27/12). Mr. Almaraz prepared a report dated January 2, 2013, and testified to the same matters set forth in this report.

Mr. Almaraz detailed essentially the same patient history and summary of care for QW set forth in Findings 6 through 9. Mr. Almaraz noted that a patient presenting for a commercial California driver license may have it granted when found medically and physically qualified, and when certified to do so by a competent medical authority. Mr. Almaraz indicated that the standard of care in such cases is to examine the patient in accordance with the Motor Carrier Safety Regulations (49 CFR 391.41 – 391.49) and to note any disqualifying factors. He opined that for a patient with a history of diabetes, hypertension, seizures, and drug use, the standard of care would be to correctly document such past medical history on the DMV form.

*DMV Certification*

12.    Mr. Almaraz noted that QW's health history on the DMV form failed to correctly note his past medical history. Specifically, seizures was marked "no", as were his history of altered consciousness and narcotic or habit forming drug use, all of which were clearly noted in QW's clinical notes, along with his history of noncompliance with his medications. Mr. Almaraz explained that QW's documented health history of non-compliance, seizure disorder, altered mental status, and substance abuse would have disqualified him from being certified to drive a commercial vehicle. He opined that respondent departed from the standard of care when he certified QW as medically qualified, when his health history indicated otherwise. Importantly, the fact that QW was on insulin

5

automatically disqualified him from driving a commercial motor vehicle.[2]  Mr. Almarez noted that non-certification of patients treated with insulin and their not meeting the minimum physical requirements is so stated on the DMV instructions for the medical examiner. Mr. Almaraz explained that it mattered not whether QW was truly insulin dependent. A patient on both oral medication with insulin added, is "on insulin." NIDDM[3] does not mean that a patient is not on insulin. Such a patient may be on maximum oral medication with insulin added. And IDDM and NIDDM are now listed as Type I or Type II diabetes.

Mr. Almaraz opined that respondent's certifying QW, a patient with a documented history of medication non-compliance with his diabetes and hypertension, and being on insulin, represented an extreme departure from the standard of care.

13.    Mr. Almaraz further opined that respondent's failure to address and/or document QW's medical history of seizure disorder, altered mental status, and substance abuse on the DMV form represented an extreme departure from the standard of care.

*Physician Consultation*

14.    Mr. Almaraz noted that physician assistants investigate a patient's complaints to the point of diagnosis, which includes a detailed history and physical. Diagnosis may involve testing, consulting with a supervising physician, and/or referral to other physicians. In a patient such as QW presenting with a history of diabetes mellitus, hypertension, and who was historically non-compliant, Mr. Almaraz indicated that the standard of care would be to consult with the supervising physician on an ongoing basis, which he believes was not done in this case. He noted that respondent should have consulted with his supervising physician regarding QW's condition and continued noncompliance. Mr. Almaraz characterized respondent's failure to consult with his supervising physician in this case as a simple departure from the standard of care.

*Respondent's Testimony*

15.    Respondent acknowledged that he made a mistake when he certified QW as medically qualified to drive a commercial vehicle, when his health history indicated otherwise. He noted, "I was wrong and I feel terrible about it." Respondent has performed thousands of similar physical examinations and indicated that he has never done anything

---

[2] Title 49, Code of Federal Regulations, section 391.41(b)(3) provides in pertinent part: "A person is physically qualified to drive a commercial vehicle if that person: *Has no established medical history or clinical diagnosis of diabetes mellitus currently requiring insulin for control.*" [Italics on DMV form Instructions to the Medical Examiner.]

[3] Non-insulin dependent diabetes mellitus.

like this before.  Respondent, in an earlier interview with a Board Investigator on December 7, 2012, suggested that he went out of his way to help QW and "do what I could for him to make his referrals, to make his lab work, to try and talk to him, try and talk to his wife, and try to get him to change what he was doing…"  Respondent believed that QW would only be driving a pickup truck at the time, and averred that he never would have allowed QW to drive a bus.  He represented to the Board investigator that QW "obviously convinced me that he was going to be compliant and he was off drugs and alcohol…"

16.     Respondent offers no excuse for his actions at this time.  Because of his experience in this case, he now thinks daily about the consequences of certifying an unqualified patient to drive a commercial vehicle.  He noted that prior to March 2008 he had performed hundreds of DMV physical examinations and never hesitated to find applicants unqualified for commercial driving.  He understands that his focus should properly be on the safety of the public.  Whether his patient is happy or not, is not paramount in his thought process.  He noted that he has refused to certify numerous individuals in the past who were diabetic and on insulin.  When made aware of the bus accident in this case, he was stunned.  He is not sure how it happened that he approved QW, and he has since been more scrupulous in how he goes about conducting DMV examinations.  He described himself as obsessive in his approach to performing physical examinations and completing the DMV forms.  Respondent makes sure he does not sign off on any documents until he has the actual information/knowledge to make medical judgments.  He appreciates that public and patient safety are the controlling factors when it comes to conducting Department of Transportation examinations, and he takes care to perform physical examinations per federal guidelines.  He looks more carefully at patient histories

17.     Individuals who conduct Department of Transportation examinations must now take and pass a national registry examination, and report monthly to a national registry.  Respondent has taken classes and passed the written national registry examination.  He is listed on the National Registry of Certified Medical Examiners (NRCME).  He reports monthly to the national registry regardless of whether he performs physical examinations.  It is also his office policy that practitioners cannot perform physical examinations unless they take and pass the national registry examination.  This then qualifies practitioners in his office to perform such examinations for a 10-year period.

Respondent is required to take 50 continuing education hours every two years.  He has taken 55 hours of category one credits for this past year alone.  He completed 80.75 hours in 2012, and 80.75 hours in 2013.  Importantly, he completed a California Academy of Family Physicians program entitled "Improving Transportation Safety:  Commercial Driver Medical Examiner Training."  This course is intended for primary care providers who conduct physical examinations for commercial motor vehicle drivers and who must complete a training course and pass a certification examination to get listed on the NRCME.

18.     Respondent noted that he has not been involved in any other malpractice case, and has not had any other complaint filed against him with the Board of which he is aware.  The events of this case caused him extreme embarrassment.  It reminds him daily to do a

better job of checking laboratory work, medical records and documents. As he pondered what he would have done differently given the chance, he noted that he would better address QW's compliance issues, and perhaps given QW up to six months to demonstrate medication compliance before issuing him a temporary license. He understands that QW would be disqualified as long as he was on insulin.

Respondent continues to perform DMV examinations, up to three per month. He estimates that he has performed approximately 150 such examinations over the six years since the incident giving rise to this case. DMV examinations comprise a small percentage of his office practice.

19.     Respondent explained that he regularly discussed non-compliant patients with Dr. Malak. He believes that he discussed QW's care with Dr. Malak, although such discussions were not documented. QW's medical records were regularly co-signed by Dr. Malak whenever QW was referred for outside work. For example, all laboratory work, x-rays, MRI, neurological consultations were signed off in QW's medical records.

*Professional/Patient References*

20.     Daren Primack, M.D. testified on behalf of respondent. Dr. Primack is a cardiovascular specialist who practices in Stockton. He interacts with respondent on a regular basis. He has known respondent professionally and personally for over 10 years. Dr. Primack noted that he gains a good sense of the thought processes of physician assistants through his conversations with them and the paperwork accompanying patient referrals from them. He indicated that the best physician assistants "have to be bright and persistent, but willing to be humble about not being omniscient." He believes respondent is an excellent physician assistant who takes his responsibilities seriously. He found respondent's patient charts to be detailed and thorough, and showing that he was thinking about the right things. Dr. Primack noted that respondent makes appropriate and timely referrals, and is careful about practicing within his limits, particularly within the area of cardiovascular disease. He described respondent as "a role model for ancillary providers in our community, and in my opinion is more capable than a number of primary care physicians."

21.     Respondent submitted a reference letter dated November 21, 2013, from Robert H. Craig, D.O.  Dr. Craig has supervised respondent from 2012, and he has found respondent's work and knowledge to be "impeccable and top of his profession." He noted:

> He shows superior expertise in all areas of family practice and
> through all of my reviews of his charts, I have never found an
> issue where it was necessary to make any corrections or changes
> to the care he has provided his patients. His charting is some of
> the best I have seen and I can attest to the extra measure David
> takes to ensure his patients receive the best care possible. David
> is trustworthy and capable and I can tell you without a doubt,
> that his patients love him and truly appreciate his skills,

> compassion and his hard work. He not only treats his patients
> appropriately, he spends time to educate and communicate with
> each and every patient he encounters.

22.     Three patient reference letters were submitted by Monica Mayberry, Irma
Villasenor and Dominga Gier, all written in December 2013. They speak glowingly of
respondent's medical care and treatment of them and others within their community.

## Discussion

23.     Complainant demonstrated that respondent's conduct in certifying QW, a
patient with a documented history of medication non-compliance with his diabetes and
hypertension, and being on insulin, represented an extreme departure from the standard of
care. Because QW was on insulin, respondent should have automatically disqualified him.
Respondent does not disagree. Complainant further demonstrated that respondent's failure to
document QW's medical history of seizure disorder, altered mental status, and substance
abuse on the DMV form represented an extreme departure from the standard of care.

Complainant did not establish through clear and convincing evidence that respondent
failed to consult with his supervising physician regarding QW's noncompliance in taking
medications for diabetes and hypertension. Respondent testified credibly to his pattern and
practice of discussing non-compliant patients with Dr. Malak, and he believes that he
discussed QW's care with Dr. Malak. Dr. Malak was generally familiar with QW's medical
history, as evidenced by his co-signing a number of referrals for outside laboratory work, x-
rays, MRI, and neurological consultations.

24.     When all the evidence is considered, it would be consistent with the public
interest to allow respondent to retain his license on a probationary basis. Except for this one
incident, respondent has an excellent record of practice as a physician assistant in California
dating back to 1986. He has acknowledged and accepted responsibility for his actions in
connection with certifying QW to drive commercial vehicles. He knew better. His actions
are best viewed as an aberration, and not consistent with his usual pattern and practice of
performing careful physical examinations, and providing informed responses on DMV
forms. He has since undergone additional commercial driver medical examiner training and
passed the written national registry examination. He is currently listed on the National
Registry of Certified Medical Examiners. Respondent's continuing education hours have
consistently exceed minimum requirements. Additional remedial training in areas where his
practice was deficient is unnecessary at this time.

Dr. Primack testified credibly to respondent being a thorough and knowledgeable
practitioner who is dedicated to his patients. Respondent is considered a role model for
ancillary providers within his medical community. By all accounts respondent is well liked
and respected by his patients, and highly regarded within the Stockton and San Joaquin
Valley medical communities where he has practiced for 20 years. The events of this case
have only motivated him to learn from his mistakes and to exercise greater care and focus in

9

his physician assistant practice. It is apparent that he has done so, and there is every indication that he will continue to be, as Dr. Craig described him, "one of the biggest assets to his profession and to the community he serves."

Respondent serves his community in other ways. He conducts sports physicals for Galt, Manteca and Liberty Branch High Schools. He makes volunteer visits to patients in intermediate care facilities. Respondent also serves as a preceptor for physician assistant students.

*Costs*

25.     Pursuant to Business and Professions Code section 125.3, complainant has requested that respondent be ordered to pay costs for the investigation and enforcement of this case in the total amount of $10,879.50. In support of these cost requests, complainant submitted: (1) a Certification of Prosecution Costs: Declaration of Jannsen Tan; (2) Cost of Suit Summary; and (3) Matter Time Activity by Professional Type. The Certification of Costs submitted by the Deputy Attorney General requests costs in the amount of $10,582.50 for the work performed by Deputy Attorney General, and $297 for work performed by legal analysts on this case. Attached to the certification is a computer printout showing the tasks performed by the Deputy Attorney General including pleading and trial preparation, analysis/strategy, witness-related preparation, communications with client and other party, and settlement/prehearing conference. The Deputy Attorney General hours on this case total 62.25. The requested costs are reasonable in light of the allegations set forth in the Accusation.

26.     Respondent is partially disabled following spinal surgery in 2011 and 2012. He receives Social Security Disability income, and his income was reduced by 75 percent following his disability. He depends upon his wife's income. Complainant's request for costs and respondent's testimony regarding his ability to pay are addressed below in the Legal Conclusions.

### LEGAL CONCLUSIONS

1.     Pursuant to Business and Professions Code section 3527, subdivision (a), the Board may discipline the license of a licensee who engages in "unprofessional conduct" in violation of the Physician Assistant Practice Act (Bus. Prof. Code, § 3500 et seq.), the Medical Practices Act (Bus. & Prof. Code, § 2000 et seq.), the Board's regulations, and the regulations of the Medical Board of California.

2.     Business and Professions Code section 2234, in relevant part, provides:

The board shall take action against any licensee who is

charged with unprofessional conduct.  In addition to other
provisions of this article, unprofessional conduct includes, but is
not limited to, the following:

   (a) Violating or attempting to violate, directly or indirectly,
assisting in or abetting the violation of, or conspiring to violate
any provision of this chapter.

   (b) Gross negligence.

   (c) Repeated negligent acts.  To be repeated, there must be
two or more negligent acts or omissions.  An initial negligent
act or omission followed by a separate and distinct departure
from the applicable standard of care shall constitute repeated
negligent acts.

      (1) An initial negligent diagnosis followed by an
      act or omission medically appropriate for that
      negligent diagnosis of the patient shall constitute
      a single negligent act.

      (2) When the standard of care requires a change
      in the diagnosis, act, or omission that constitutes
      the negligent act described in paragraph (1),
      including, but not limited to, a reevaluation of the
      diagnosis or a change in treatment, and the
      licensee's conduct departs from the applicable
      standard of care, each departure constitutes a
      separate and distinct breach of the standard of
      care.

   3.     Cause exists for disciplinary action against respondent pursuant to Business
and Professions Code sections 2234, subdivision (b), and 3527, subdivision (a).  Respondent
engaged in multiple errors and omissions in connection with his care and treatment of QW
that were each an extreme departure from the standard of care, and therefore constituted
gross negligence.  Specifically, his certifying a patient with a documented history of
medication non-compliance with his diabetes and hypertension, and being on insulin,
constituted an extreme departure from the standard of care; as did his failure to document
QW's medical history of seizure disorder, altered mental status, and substance abuse on the
DMV form.  (See Findings 10 through 13.)

   A lack of ordinary care defines negligent conduct.  Gross negligence, however, is
defined by an error or omission that is egregious and flagrant.  "Gross negligence has been
said to mean the want of even scant care or an extreme departure from the ordinary standard

of conduct." (*Van Meter v. Bent Construction Co.* (1946) 46 Cal.2d 588.) This definition was satisfied in this case.

4.     Cause exists for disciplinary action against respondent pursuant to Business and Professions Code sections 2234, subdivision (c), and 3527, subdivision (a). Respondent engaged in repeated negligent acts. (See Findings 10 through 13.)

Complainant has therefore established cause to discipline respondent's license for unprofessional conduct under Business and Professions Code sections 2234 and 3527.

5.     As set forth in Findings 23 and 24, it would be consistent with the public interest to allow respondent to retain his license on a probationary basis. He has had, apart from the incident in this case, an excellent record of practice since 1986 as a physician assistant in California. He has acknowledged and accepted full responsibility for his actions in connection with certifying QW to drive commercial vehicles. And he has engaged in serious remedial education and efforts, including training to perform commercial driver medical examinations and passing the written national registry examination. He is listed on the National Registry of Certified Medical Examiners. His continuing education hours have consistently exceeded minimum requirements. For these reasons, additional remedial training in areas where his practice was deficient is unnecessary and would serve no purpose at this time.

6.     Pursuant to Business and Professions Code section 125.3, a licensee found to have violated a licensing act may be ordered to pay the reasonable costs of investigation and prosecution of a case. In *Zuckerman v. Board of Chiropractic Examiners* (2002) 29 Cal.4th 32, the California Supreme Court set forth factors to be considered in determining the reasonableness of the costs sought pursuant to statutory provisions like Business and Professions Code section 125.3. These factors include whether the licensee has been successful at hearing in getting charges dismissed or reduced, the licensee's subjective good faith belief in the merits of his or her position, whether the licensee has raised a colorable challenge to the proposed discipline, the financial ability of the licensee to pay, and whether the scope of the investigation was appropriate in light of the alleged misconduct.

7.     Complainant seeks $10,879.50 in costs. As set forth in Finding 25, these costs are reasonable in light of the allegations made in this case. Respondent was successful in getting one charge – that he failed to consult with his supervising physician regarding QW's medication noncompliance – dismissed. Respondent had a subjective good faith belief in the merits of his position. He raised a sufficient challenge to the proposed discipline. The investigation was appropriate in light of the alleged misconduct. Respondent submitted evidence which demonstrated that he does not have the financial ability to pay all the costs at this time. When the *Zuckerman* factors are considered, particularly his ability to pay, the costs charged to respondent should be reduced to $6,000. Respondent may pay these costs over time in accordance with a payment plan established by the Board or its designee.

ORDER

License number PA 11818 issued to respondent David T. Anslinger is REVOKED pursuant to Legal Conclusions 3 and 4, individually and for both of them. However, the revocation is stayed and respondent is placed on probation for three (3) years upon the following terms and conditions:

1.    Approval of Supervising Physician.  Within 30 days of the effective date of this decision, respondent shall submit to the Board or its designee for its prior approval the name and license number of the supervising physician and a practice plan detailing the nature and frequency of supervision to be provided.  Respondent shall not practice until the supervising physician and practice plan are approved by the Board or its designee.

Respondent shall have the supervising physician submit quarterly reports to the Board or its designee.

If the supervising physician resigns or is no longer available, respondent shall, within 15 days, submit the name and license number of a new supervising physician for approval.

2.    Notification of Employer and Supervising Physician.  Respondent shall notify his current and any subsequent employer and supervising physician(s) of the discipline and provide a copy of the accusation, decision, and order to each employer and supervising physician(s) during his period of probation, at onset of that employment.  Respondent shall ensure that each employer informs the Board or its designee, in writing within 30 days, verifying that the employer and supervising physician(s) have received a copy of Accusation, Decision, and Order.

3.    Obey All Laws.  Respondent shall obey all federal, state, and local laws, and all rules governing the practice of medicine as a physician assistant in California and remain in full compliance with any court ordered criminal probation, payments, and other orders.

4.    Quarterly Reports.  Respondent shall submit quarterly declarations under penalty of perjury on forms provided by the Board or its designee, stating whether there has been compliance with all the conditions of probation.

5.    Other Probation Requirements.  Respondent shall comply with the Board's probation unit.  Respondent shall, at all times, keep the Board and probation unit informed of respondent's business and residence addresses. Changes of such addresses shall be immediately communicated in writing to the Board and probation unit.  Under no circumstances shall a post office box

13

serve as an address of record, except as allowed by California Code of Regulations 1399.523.

Respondent shall appear in person for an initial probation interview with the Board or its designee within 90 days of the decision. Respondent shall attend the initial interview at a time and place determined by the Board or its designee.

Respondent shall, at all times, maintain a current and renewed physician assistant license.

Respondent shall also immediately inform the probation unit, in writing, of any travel to any areas outside the jurisdiction of California which lasts, or is contemplated to last, more than thirty (30) days.

6.     Interview with Medical Consultant. Respondent shall appear in person for interviews with the Board's medical or expert physician assistant consultant upon request at various intervals and with reasonable notice.

7.     Tolling for Out-of-State Practice or Residence. The period of probation shall not run during the time respondent is residing or practicing outside the jurisdiction of California. If, during probation, respondent moves out of the jurisdiction of California to reside or practice elsewhere, including federal facilities, respondent is required to immediately notify the Board in writing of the date or departure, and the date or return, if any.

Respondent's license shall be automatically canceled if respondent's period of temporary or permanent residence or practice outside California totals two years. Respondent's license shall not be canceled as long as respondent is residing and practicing as a physician assistant in another state of the United States and is on active probation with the physician assistant licensing authority of that state, in which case the two year period shall begin on the date probation is completed or terminated in that state.

8.     Failure to Practice as a Physician Assistant – California Resident. In the event respondent resides in California and for any reason respondent stops practicing as a physician assistant in California, respondent shall notify the Board or its designee in writing within 30 calendar days prior to the dates of non-practice and return to practice. Any period of non-practice within California, as defined in this condition, will not apply to the reduction of the probationary term and does not relieve respondent of the responsibility to comply with the terms and conditions of probation. Non-practice is defined as any period of time exceeding 30 calendar days in which respondent is not practicing as a physician assistant.

All time spent in a clinical training program that has been approved by the Board or its designee, shall be considered time spent in the practice of medicine. For purposes of this condition, non-practice due to a Board-ordered suspension or in compliance with any other condition or probation, shall not be considered a period of non-practice.

Respondent's license shall be automatically canceled if, for a total of two years, respondent resides in California and fails to practice as a physician assistant.

9.     Unannounced Clinical Site Visit.  The Board or its designee may make unannounced clinical site visits at any time to ensure that respondent is complying with all terms and conditions of probation.

10.     Condition Fulfillment.  A course, evaluation, or treatment completed after the acts that gave rise to the charges in the accusation but prior to the effective date of the decision may, in the sole discretion of the Board or its designee, be accepted towards the fulfillment of the condition.

11.     Completion of Probation.  Respondent shall comply with all financial obligations (e.g., cost recovery, probation costs) no later than 60 calendar days prior to the completion of probation.

Upon successful completion of probation, respondent's license will be fully restored.

12.     Violation of Probation.  If respondent violates probation in any respect, the Board after giving respondent notice and the opportunity to be heard, may revoke probation and carry out the disciplinary order that was stayed.  If an accusation or petition to revoke probation is filed against respondent during probation, the Board shall have continuing jurisdiction until the matter is final, and the period of probation shall be extended until the matter is final.

13.     Cost Recovery.  Respondent is hereby ordered to reimburse the Physician Assistant Board the amount of $6,000 within 90 days from the effective date of this decision for its investigative costs.  Failure to reimburse the Board's costs for its investigation shall constitute a violation of the probation order, unless the Board agrees in writing to payment by an installment plan because of financial hardship.  The filing of bankruptcy by respondent shall not relieve respondent of his responsibility to reimburse the Board for its investigative costs.

14.     Probation Monitoring Costs.  Respondent shall pay the costs associated with probation monitoring each and every year of probation, as

designated by the Board, which may be adjusted on an annual basis. The costs shall be made payable to the Physician Assistant Board and delivered to the Board no later than January 31 of each calendar year.

15. <u>Voluntary License Surrender</u>. Following the effective date of this probation, if respondent ceases practicing due to retirement, health reasons, or is otherwise unable to satisfy the terms and conditions of probation, respondent may request the voluntarily surrender of respondent's license to the Board. The Board reserves the right to evaluate the respondent's request and to exercise its discretion whether to grant the request, or to take any other action deemed appropriate and reasonable under the circumstances. Upon formal acceptance of the surrender, respondent shall within 15 days deliver respondent's wallet and wall certificate to the Board or its designee and shall no longer practice as a physician assistant. Respondent will no longer be subject to the terms and conditions of probation and the surrender of respondent's license shall be deemed disciplinary action. If respondent re-applies for a physician assistant license, the application shall be treated as a petition for reinstatement of a revoked license.

DATED: September 9, 2014

JONATHAN LEW
Administrative Law Judge
Office of Administrative Hearings